# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARVIN PETER LEBLANC, JR. | * | CIVIL ACTION NO. 14-1617 c/w 14-1772, 14-1791, 14-1875, 14-2326, 18-2296 |
| versus | * | REF: 14-1791 (MILLER) |
| | * | |
| PANTHER HELICOPTERS, INC., ET AL. | * | SECTION: J(4) |
| | * | JUDGE CARL J. BARBIER MAG. JUDGE KAREN WELLS ROBY |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a non-jury trial to determine the amount of damages Plaintiff Nicholas Miller ("Miller") sustained as a result of a helicopter crash on October 9, 2013.[1] At the conclusion of trial, the Court took the matter under advisement. Having considered all the evidence, the arguments of counsel, and the applicable law, the Court now issues these Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent a finding of fact constitutes a conclusion of law, or vice versa, it shall be treated as such, labels notwithstanding.

### Incident Overview and Procedural History

At the time of the crash, Miller was employed by Wood Group, PSN, Inc. ("Wood Group"), as a B Operator on a fixed offshore production platform known as Main Pass 107D, located approximately thirty-seven miles off the coast of

---

[1] Issues concerning liability for Miller's injuries are not before the Court at this time. (*See* Minute Entry at 2, Rec. Doc. 667 (granting Defendants' motion to reverse bifurcate).)

Louisiana. On the morning of October 9, 2013, Miller and two of his coworkers boarded a Bell 206L-3 helicopter to return home after completing a fourteen-day hitch on the MP 107D platform. Shortly after lifting off from the platform, the helicopter lost power and fell roughly 200 feet into the Gulf of Mexico. Miller and his coworkers survived the crash, albeit with varying injuries. The helicopter's pilot also survived the initial impact, but drowned before rescuers could free him from the helicopter. The crash is described in further detail below.

In 2014, Miller, his two coworkers, and the pilot's survivors brought actions seeking damages for the helicopter crash, which were consolidated before the undersigned. Proceedings were delayed first by an investigation into the crash by the National Transportation and Safety Board and then by Energy XXI GOM, L.L.C.'s Chapter 11 bankruptcy.[2] Litigation resumed and, following mediation in May of 2018, the parties settled each of the plaintiffs' claims but Miller's. The Court subsequently granted Defendants' motion to reverse bifurcate the trial on Miller's claim.[3] (Rec. Doc. 667.) Consequently, the only issue presently before the Court is what amount reasonably compensates Miller for his injuries caused by the helicopter crash. Furthermore, only three defendants remain: Panther Helicopters, Inc. (the owner of the helicopter), Rolls Royce Corporation (the type certificate holder for the helicopter's engine), and Standard Aero Limited (which overhauled certain parts of the engine) (collectively, "Defendants"). Wood Group and its self-

---

[2] Energy XXI GOM, L.L.C. owned the MP 107D platform.
[3] In their motion to bifurcate, Defendants conceded that Nicholas Miller is without fault for the accident. (Rec. Doc. 654-1 at 4.) Defendants further represented that "[a]lthough defendants and their experts disagree on the cause of the loss of engine power, defendants agreed among themselves how to apportion payment to be made to plaintiffs." (Rec. Doc. 654-1 at 8; *see also* Pretrial Order at 16, Rec. Doc. 713.)

insurer, Signal Mutual Indemnity Association, Ltd. ("Signal"), intervened to assert a lien for amounts paid to or on behalf of Miller under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, et seq. The issue of damages was tried to the bench on October 15 and 16, 2018.

## Past General Damages

On October 9, 2013, Miller was seated behind the helicopter's pilot. In the rear seat next to Miller sat Peter LeBlanc, Miller's coworker. Miller's other coworker was seated in the front of the helicopter, next to the pilot. Shortly after lifting off from the platform, Miller heard a loud pop followed by a whining noise. The helicopter then fell, nose first, toward the water. Miller saw the water quickly approaching and thought, "I'm about to die."

The impact was violent; Miller described it as jumping off a building and hitting cement. Miller felt excruciating pain in his back. He testified that it was as though he had been stabbed in the back with a knife.

Water quickly began filling the helicopter. Peter LeBlanc said he could not feel his legs, which Miller saw were floating, limp, in the rising water. Miller unlatched his seatbelt, opened one of the helicopter's doors, and exited the helicopter. At that time the M/V EVERREADY, a crewboat that was standing by at a neighboring platform, was speeding to the crash site from a couple hundred yards away. It arrived and threw Miller a life ring. Miller slipped into the water and swam to the life ring. The EVERREADY's crew then pulled Miller to the vessel.

3

Miller watched from the EVERREADY as members of its crew jumped in the water to help the three other people still in the helicopter. Miller's two coworkers were retrieved, alive but seriously injured, and brought on board another boat. However, the helicopter capsized before the pilot could be rescued. The pilot was eventually freed and brought, unconscious, on board the EVERREADY. Miller saw the pilot's body. The EVERREADY's crew performed CPR on the pilot, but they could not revive him. Miller was later flown by helicopter to a hospital onshore. He was released around 5:00 p.m. to his parents, who brought him home to Basile, Louisiana.

As for physical injuries, the Court finds that the helicopter crash caused Miller compression fractures to four vertebrae, T7, T8, L1 and L2. Although these fractures did not require surgery, they were painful to endure. Miller wore a "Jewett" brace for three months at the recommendation of the initial evaluating orthopedic surgeon, who was selected by Miller's employer. By April 2015, the injuries to Miller's spine had healed. Nevertheless, there is some permanent loss of height and wedging of these four vertebrae. Moreover, Miller continues to experience some pain and limitations due to his injury. Notably, the Court finds by a preponderance of the evidence that Miller was and remains restricted to medium duty and that he cannot perform several of the tasks required of a B Operator, his former job with Wood Group. Miller also experiences pain in his back after exerting himself for an extended period, or after being seated for an extended period, etc.

Miller suffered psychological injuries as well. The crash itself was a terrifying event that presented a very real threat to Miller's life. After the crash, Miller experienced nightmares that caused him to wake up screaming in the middle of the night. A recurring theme in his dreams was that the deceased pilot was standing near his bed. Miller, his mother, and his girlfriend all testified as to some of these experiences, and the Court finds each of these witnesses credible in this regard. Miller also experienced guilt and anxiety as a result of the accident. For example, Miller testified that he feels guilty for leaving his coworkers and the pilot in the helicopter. Dr. Ted Friedberg, a board certified clinical psychologist, diagnosed Miller with Post Traumatic Stress Disorder ("PTSD") two months after the crash and referred Miller to Dr. Ron Ray, a licensed professional counselor, for treatment. Miller's psychological condition has improved over the five years since the crash, but, as with his physical injuries and as further described below (*see* Future General Damages), some negative psychological effects of the crash remain.

In summary, the October 9, 2013 helicopter crash was a traumatic event, both physically and psychologically. The impact was physically painful and caused compression fractures to four of Miller's vertebrae. Miller also suffered from PTSD, guilt, and anxiety as a result of the crash. Although some of these injuries have resolved, others remain.

As compensation for his past (i.e., from the date of the accident, October 9, 2013, until the date of trial, October 15, 2018) physical pain and psychological

injuries, as well as the diminished value of life resulting therefrom, the Court finds that Miller is entitled to damages in the amount of $300,000.00.

**Future General Damages**

As to physical pain, the Court finds that Miller will continue to experience some pain in his back for the rest of his life. As mentioned, Miller experiences pain in his back after exerting himself for an extended period, or after being seated for an extended period, etc. Miller will also continue to have some physical limitations.

As to psychological injuries, the Court similarly finds that Miller has partially, but not entirely, recovered. A preponderance of the evidence establishes that Miller no longer meets the criteria for a PTSD diagnosis under the Diagnostic and Statistical Manual of Mental Disorders, 5th ed. ("DSM-V"). However, the Court finds that Miller continues to experience some guilt, anxiety, and occasional nightmares, even though they no longer support a PTSD diagnosis. Notably, while Defendants' expert in clinical psychology concluded that Miller did not meet all of the DSM-V's criteria when she evaluated him in the summer of 2018, she did opine that he met some of the PTSD criteria "without reserve" and diagnosed him with "Adjustment Disorder with mixed depressive and anxiety presentation." (Trial Ex. 47-017, -021.) As further evidence of remaining psychological impacts of the crash, there appears to be little dispute, if any, that Miller cannot engage in any work that would require helicopter travel, regardless of his physical condition. It does appear to the Court that Miller's psychological injuries do not affect his life generally; rather, they are acute and triggered by particular stimuli, such as hearing a

helicopter or when Miller sees his now-paralyzed coworker, Peter LeBlanc, who lives in the same town as Miller.

It is also relevant to note that Miller is currently 26 years old (he was 21 at the time of the crash). Given his young age, Miller will experience the remaining physical and psychological injuries for a long time.

As compensation for his future physical pain and psychological injuries, as well as the diminished enjoyment of life resulting therefrom, the Court finds that Miller is entitled to damages in the amount of $100,000.00.

**Past Lost Wages**

Lost wages are determined by calculating the amount of money Miller proved by a preponderance of the evidence that he would have earned had the accident not occurred, less any wages he earned or was capable of earning since the accident. Under maritime law, the award for lost wages must be based on after-tax earnings. The relevant time period for calculating past lost wages is October 9, 2013 (the date of the crash) to October 15, 2018 (the date of trial).

The parties agree on most of the variables used to calculate Miller's past lost wages. For example, the parties agree that at the time of the accident, Miller's annual pre-tax income from his job as a B Operator with Wood Group was around $53,000. The parties further agree that, based on this figure, had the crash not occurred Miller's total after-tax earnings from the date of the accident until trial would have been $222,705.00. The major point of disagreement is what amount Miller should have earned, or was capable of earning, after the accident.

Defendants concede that Miller should not have earned any money between the time of the accident until April 1, 2015. Defendants assert that after April 1, 2015, Miller should have earned at least $55,000 a year pre-tax, and, using this amount, Defendants calculate Miller's after-tax past lost wages to be $63,801.82. Alternatively, Defendants propose that if Miller was capable of earning only $40,000 a year pre-tax beginning on April 1, 2015, then Miller's after-tax past lost wages would be $94,295.29. Miller, on the other hand, asserts that his past lost wages are $222,705.00, which is based on the assertion that Miller neither earned nor was capable of earning any income after the accident and prior to trial.

Miller's position is plainly incorrect, as there is ample evidence that Miller earned some money working after the accident, although it is unclear how much he worked or how much he earned. However, the Court finds that $40,000 a year in pre-tax income (i.e., Defendants' lower alternative proposal) far over-estimates what Miller was capable of earning from April 1, 2015 until trial.

Considering, among other things, Miller's physical restrictions and psychological impairments at the time, the Court finds that the average amount Miller was capable of earning from April 1, 2015 to October 15, 2018 was $10 an hour at full time, which is $20,800 in annual pre-tax income. From this figure, the Court estimates Miller's past lost wages to be $149,000.[4]

---

[4] $20,800 x 3.54 years = $73,632. $222,705 – 73,632 = $149,073. The Court notes that $20,800 is a pre-tax figure, while its calculation should use an after-tax figure. However, the Court finds that the tax on $20,800 would be minimal. Furthermore, estimating what Miller was "capable" of earning is not an exact science.

**Future Lost Wages**

With respect to future lost wages, Defendants assert Miller is capable of earning at least $55,000 a year (pre-tax) and, based on this figure, Miller has no future losses. Alternatively, Defendants propose that if Miller earned around $40,000 a year (pre-tax), his after-tax future lost wages would be around $260,492.89. Miller contends that he will earn around $20,800 a year (pre-tax) and calculates his after-tax future lost wages to be $827,267.

As discussed above, the Court finds Miller was capable of earning around $20,800 a year (pre-tax) during the period April 1, 2015 until October 15, 2018. Going forward, the Court finds that Miller's earning capacity will increase over time, eventually rising to around $40,000 a year (pre-tax). Therefore, Miller's estimate of his future annual pre-tax income is too low, and his calculation of future lost wages is too high. Conversely, Defendant's alternative proposal that Miller is immediately able to earn $40,000 a year is too high, and thus their calculation for future lost wages is too low.

The Court finds that a reasonable estimate of Miller's after-tax future lost wages is $400,000.

**Past Medical Expenses**

Miller and the Defendants stipulated that Miller's past medical expenses total $64,302.49. (Joint Ex. 52-001.) The Court finds that Miller is entitled to past medical expenses of *at least* this much. This amount may be amended depending on

9

the outcome of a dispute over whether certain items are included in a lien asserted by Signal/Wood Group. This issue is discussed below.

## Future Medical Expenses

No evidence was presented regarding future medical expenses. Accordingly, the Court finds that Miller's future medical expenses is $0.

## Signal/Wood Group's LHWCA Lien

Signal was responsible for discharging Wood Group's liabilities to its employees under the LHWCA. The parties entered a stipulation stating that since the date of and in connection with the October 9, 2013 helicopter crash, and pursuant to the LHWCA, Signal and Wood Group have paid medical/non-indemnity benefits to and on behalf of Miller totaling $80,724.05 and indemnity benefits to Miller totaling $129,691.37. (Rec. Doc. 733.) The sum of these amounts is $210,415.42.

Signal and Wood Group intervened to assert a lien against Miller's recoveries for the amounts it paid under the LHWCA. There is a dispute, however, over whether certain expenses can be included in Signal/Wood Group's lien. The disputed expenses are: vocational expenses of $5,565.95, audit charges of $834.99, medical management expenses of $10,521.94, doctor's conference fees of $950.00, and travel reimbursement to Miller of $9,729.89. The total amount of these disputed expenses is $27,602.77. If each of these disputed expenses are excluded, then the total amount of Signal/Wood Group's lien is $182,812.65.

The Court does not determine at this time the amount of Signal/Wood Group's LHWCA lien. The parties are instructed to submit briefs on this issue, which shall be filed no later than **fourteen days** from the entry of this Findings of Fact and Conclusions of Law.

## Conclusions of Law

This matter is before the Court under admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and pursuant to § 905(b) of the LHWCA, 33 U.S.C. § 905(b).

This matter is identified as an admiralty and maritime claim in accordance with Fed. R. Civ. P. 9(h).

The only issue presently before the Court is what amount reasonably compensates Miller for injuries caused by the helicopter crash.

As explained above, Plaintiff Nicholas Miller is entitled to damages in the following amounts:

| | |
|---|---:|
| Past General Damages | $300,000.00 |
| Future General Damages | $100,000.00 |
| Past Lost Wages | $149,000.00 |
| Future Lost Wages | $400,000.00 |
| Past Medical Expenses[5] | at least $64,302.49 |
| Future Medical Expenses | $0.00 |
| **Total** | **$1,013,302.49** |

Additionally, Miller is entitled to prejudgment interest at 6% per annum from October 9, 2013 until judgment is entered, postjudgment interest at the rate set by

---

[5] The amount for Past Medical Expenses may be amended depending on the resolution of the dispute over the amount of Signal/Wood Group's LHWCA lien, discussed above.

28 U.S.C. § 1961 from the date judgment is entered until paid, and costs other than attorneys' fees pursuant to Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.

New Orleans, Louisiana, this 26th day of October, 2018.

_____
United States District Judge